J. L. AZEVEDO AND UNITED STATES FIDELITY AND GUARANTY COMPANY, APPELLANTS, v. BOLTON F. MINISTER, RESPONDENT.

No. 6096

July 9, 1970                                        471 P.2d 661

*Sidney W. Robinson* and *Frank Cassas,* of Reno, for Appellants.

*Johnson & Sloan* and *Virgil D. Dutt,* of Reno, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

This case centers about the enforceability of an oral agreement to purchase 1,500 tons of hay. The principal issue presented for our determination is whether the periodic accountings prepared by the seller and sent to the buyer covering the sale of the hay constituted confirming memoranda within the provisions of NRS 104.2201(2) of the Uniform Commercial Code and, if so, whether the seller sent them within a reasonable time as required by that statute so that the oral agreement is not barred by the statute of frauds. The district judge ruled that the mandates of NRS 104.2201(2) had been satisfied, and he upheld the validity of the agreement. We agree, and we affirm the judgment of the lower court.

1. *The Facts.*

Appellant J. L. Azevedo is a rancher who buys and sells hay. He is licensed to do so, and he is bonded by appellant United States Fidelity and Guaranty Company. Respondent Bolton F. Minister operates the Minister Ranch near Yerington, Nevada, where he raises and sells large quantities of hay.

In early November 1967, Azevedo approached Minister for the purpose of buying hay. Terms were discussed. Several days later an agreement was reached by telephone. Both parties acknowledge that Azevedo agreed to purchase hay from Minister at a price of $26.50 per ton for the first and second cuttings and $28 per ton for the third cutting and that the parties opened an escrow account in a Yerington bank in Minister's favor, where Azevedo agreed to deposit sufficient funds to cover the cost of the hay as he hauled it from the Minister Ranch.[1] The parties are in dispute as to the total quantity of hay Azevedo agreed to purchase. Minister claims Azevedo contracted to purchase 1,500 tons. Azevedo maintains that they never had an agreement as to quantity. Soon after this telephone conversation, Azevedo deposited $20,000 in the designated escrow account and began hauling hay from the Minister Ranch. As Azevedo hauled the hay, Minister furnished him with periodic accountings, commencing December 4, which specified the dates the hay was hauled, names of the truckers, bale count, and weight. This arrangement was satisfactory to the parties, and it continued until the latter part of March 1968, when Minister loaded only two of four trucks sent by Azevedo for hay, because the funds on deposit in the escrow account were insufficient to cover all four loads. Azevedo then refused to buy any more hay, and Minister commenced this action in district court.

2. *The Statute of Frauds.*

The determination of the legal issues presented for our consideration will turn on our interpretation of NRS 104.2201(2) of the Uniform Commercial Code. Since the enactment of the Uniform Commercial Code, sweeping changes have been effectuated in the law of commercial transactions. NRS 104.2201 provides:

"1. Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforcible [sic] by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has

---

[1] Azevedo deposited a total sum of $23,000 in the account.

been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforcible [sic] under this subsection beyond the quantity of goods shown in such writing.

"2.   Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection 1 against such party unless written notice of objection to its contents is given within 10 days after it is received.

"3.   A contract which does not satisfy the requirements of subsection 1 but which is valid in other respects is enforcible [sic]:

"(a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

"(b) If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforcible [sic] under this provision beyond the quantity of goods admitted; or

"(c) With respect to goods for which payment has been made and accepted or which have been received and accepted (NRS 104.2606)."

As with all codifications, it was impossible for the Uniform Commercial Code to encompass every conceivable factual situation. Realizing this limitation, its drafters couched much of the language of the text and comments in broad generalities, leaving many problems to be answered by future litigation.

The development of the action of *assumpsit* in the fourteenth century gave rise to the enforceability of the oral promise. Although parties to an action could not be witnesses, the alleged promise could be enforced on the strength of oral testimony of others not concerned with the litigation. Because of this practice, a party could readily suborn perjured testimony, resulting in marked injustice to innocent parties who were held legally obligated to promises they had never made.[2]

---

[2] 2 A. Corbin, Contracts § 275, at 2 (1950).

The statute of frauds was enacted to preclude this practice.[3] The passage of the statute did not eliminate the problem, but rather, has precipitated a controversy as to the relative merits of the statute. Those favoring the statute of frauds insist that it prevents fraud by prohibiting the introduction of perjured testimony.[4] They also suggest that it deters hasty action, in that the formality of a writing will prevent a person from obligating himself without a full appreciation of the nature of his acts.[5] Moreover, it is said, since business customs almost entirely conform to the mandates of the statute, an abolition of the statute would seriously disrupt such affairs.[6]

On the other hand, in England the statute of frauds has been repealed.[7] The English base their position upon the reasoning that the assertion of the technical defense of the statute aids a person in breaking a contract and effects immeasurable harm upon those who have meritorious claims.[8]

It is further maintained by the advocates of the English position that the rationale for the necessity of the statute has been vitiated, because parties engaged in litigation today may testify as witnesses and readily defend against perjured testimony.[9]

The Uniform Commercial Code, however, has attempted to strike a balance between the two positions by seeking to limit the defense of the statute to only those cases where there is a definite possibility of fraud.

It is in the light of this historical background that we turn

---

[3]Statute of Frauds, 1677, 29 Car. 2, c. 3 (repealed). The amount of the transaction necessary to bring the sale within the statute was 10 pounds.

[4]2 A. Corbin, Contracts § 275, at 3 (1950); 3 S. Williston, Contracts § 448, at 346.

[5]L. Fuller, Basic Contract Law, *The Statute of Frauds* 940, 943 (1947).

[6]L. Vold, Sales § 14, at 89 (2d ed. 1959).

[7]Law Reform Act, 1954, 3 Eliz. 2, c. 34.

[8]Burdick, *A Statute for Promoting Fraud,* 16 Colum.L.Rev. 273 (1916); 42 L.Q.Rev. 1 (1927); 2 A. Corbin, Contracts § 275, at 3 (1950); 68 L.Q.Rev. 4 (1952); 70 L.Q.Rev. 441 (1954).

[9]L. Vold, Sales § 14, at 88 (2d ed. 1959). Advocates of The Sales Act have advanced the argument that the technical safeguard of a writing is more important in the United States than in England because in this country a litigant has a basic right to demand trial by jury. In England such a right is within the discretion of the court; thus, in most instances the court and not the jury will make the ultimate determination as to the existence of the contract. 68 Harv.L.Rev. 383, 384 (1954).

to consider whether the oral agreement of the parties in this case is barred by the statute of frauds.

There is no question that the Azevedo-Minister agreement was oral and that its enforceability is governed by NRS 104.2201(2), supra. The sale of hay is included within the definition of the sale of "goods" as defined by NRS 104.2105 (1)[10] and NRS 104.2107(2),[11] which when read together provide that the sale of "growing crops," when they are to be "severed by the buyer or by the seller," constitutes the sale of goods within the definition of that expression in the Uniform Commercial Code. The parties agree that they are "merchants" within the meaning of that term as defined in the Code.

It is also true that the statute of frauds is no defense to that portion of the contract that has been performed under the provisions of NRS 104.2201(3)(c), supra, which makes enforceable an oral contract "[w]ith respect to goods . . . which have been received and accepted."

The legal issues are, therefore, (1) whether Minister's accountings constituted confirming memoranda within the standards of NRS 104.2201(2) and, if so, (2) whether Minister sent them within a reasonable time as required by the statute.

3. *The Confirming Memoranda.*

(a) *The accounting of January 21, 1968.*

In addition to the data set forth in the periodic accountings covering the dates on which hay was hauled, the names of the truckers, and the bale counts and weights, Minister added the following statement in his January 21 accounting to Azevedo:

---

[10]NRS 104.2105(1):

" 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (NRS 104.2107)."

[11]NRS 104.2107(2):

"A contract for the sale apart from the land of growing crops or other things attached to realty and capable of severance without material harm thereto but not described in subsection 1 is a contract for the sale of goods within this article whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance."

"From your original deposit of $20,000.00 there is now a balance of $1819.76. *At this time there remains [sic] approximately 16,600 bales of hay yet to be hauled on your purchase,* about 9200 of which are first crop, 7400 of which are second crop.

"We would appreciate hearing when you plan to haul the *balance of the hay.* Also please make a deposit to cover the hay, sufficient in amount to pay for the hay you will be currently hauling. At this time you have only about *$2.25 deposit per ton on the remaining balance of the hay,* and we cannot permit a lower deposit per ton and still consider the hay as being sold." (Emphasis added.)

Azevedo did not challenge or reply to Minister's. accountancy of January 21. Rather, he deposited an additional $3,000 in the escrow account and continued hauling hay.

(b) *The accounting of February 22, 1968.*

In the regular accounting of February 22, Minister added the following:

"Balance of deposit on approximately 14000 bales remaining to be hauled—$1635.26."

Azevedo did not challenge or reply to the February 22 accounting.

It is these two accountings that the district judge found constituted confirming memoranda within the meaning of NRS 104.2201(2). There is little authority articulating the meaning of a confirming memorandum as used in the Code. The official Comment, Uniform Laws Annotated, Uniform Commercial Code § 2–201 (1968), states at 90, 91:

"Only three definite and invariable requirements as to the [confirming] memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be 'signed', a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity."

The parties concede that the memoranda were "signed" within the meaning of the statute, but appellant Azevedo urges that neither memorandum confirms the existence of an oral contract.

While § 2–201(2) of the Code is entirely new in the commercial law field, its only effect is to eliminate the defense of the statute of frauds. The party alleging the contract still has the burden of proving that an oral contract was entered into *before* the written confirmation. The purpose of the subsection of the Code is to rectify an abuse that had developed

in the law of commerce. The custom arose among business people of confirming oral contracts by sending a letter of confirmation. This letter was binding as a memorandum on the sender, but not on the recipient, because he had not signed it.[12] The abuse was that the recipient, not being bound, could perform or not, according to his whim and the market, whereas the seller had to perform.[13] Obviously, under these circumstances, sending any confirming memorandum was a dangerous practice. Subsection (2) of section 2–201 of the Code cures the abuse by holding a recipient bound unless he communicates his objection within 10 days.

Appellant urges that the January and February accountings do not meet the standards of the subsection because neither memorandum makes reference to any oral agreement between the parties. A fair reading of the memoranda shows otherwise. The January memorandum states that, "At this time there remains [sic] approximately 16,600 bales of hay yet to be hauled on your purchase," and, further, that, "We [Minister] would appreciate hearing when you plan to haul the balance of the hay." Although neither the January nor the February memorandum refers to the previous November agreement by telephone, the language clearly demonstrates that the referred-to agreement between the parties was not an *in futuro* arrangement, but a pre-existing agreement between Azevedo and Minister. As the court said in Harry Rubin & Sons, Inc. v. Consolidated Pipe Co., 153 A.2d 472, 476 (Pa. 1959), in ruling on a case involving subsection (2) of section 2–201:

"Under the statute of frauds as revised in the Code[,] 'All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction.' " (Footnote omitted.)

The district judge found that it did so in the instant case, and the record supports his finding.

4. *The "Reasonable Time" Factor.*

Subsection 2 of NRS 104.2201 provides that the confirming memorandum must be sent within a reasonable time after the oral contract is made. Appellant argues that the delay of

---

[12]As indicated in the instant case, Minister, who signed the memorandum, could be held to deliver to Azevedo the balance of the hay on the terms indicated.

[13]The record reflects the price of hay was lower in March than in the previous November, when the parties had agreed on a tonnage price.

10 weeks (November 9 to January 21) as a matter of law is an unreasonable time. We do not agree. What is reasonable must be decided by the trier of the facts under all the circumstances of the case under consideration. Subsection 2 of NRS 104.1204 provides:

"What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

In this case, the parties commenced performance of their oral agreement almost immediately after it was made in early November. Azevedo deposited $20,000 in the designated escrow account and began hauling hay. Minister commenced sending his periodic accounting reports to Azevedo on December 14.[14] It is true that the accounting containing the confirming memorandum was not sent until January 21. It was at that time that Azevedo's deposit of $20,000 was nearing depletion. Minister so advised Azevedo in the January memorandum. Azevedo responded by making an additional deposit. He did not object to the memorandum, and he continued to haul the hay until the latter part of March. Under "the nature, purpose and circumstances" of the case, we agree with the district judge that the delay was not unreasonable.

The judgment is affirmed.

COLLINS, C. J., ZENOFF, BATJER, and THOMPSON, JJ., concur.

---

[14]Azevedo concedes that he never challenged or replied to any of the accountings.