**IOWA COMPREHENSIVE PETROLE-UM UNDERGROUND STORAGE TANK FUND BOARD, Appellant,**

v.

**MOBIL OIL CORPORATION, Appellee.**

**No. 98–372.**

Supreme Court of Iowa.

Feb. 16, 2000.

Thomas J. Miller, Attorney General, David R. Sheridan and David S. Steward, Assistant Attorneys General, and John R. Perkins of Shearer, Templer & Pingel, West Des Moines, for appellant.

Robert V.P. Waterman, Jr. and Judith L. Herrmann of Lane & Waterman, Davenport, for appellee.

Brenda Myers of Barnhill & Goodman, West Des Moines, for amicus curiae Shell Oil Company.

Considered by McGIVERIN, C.J., CARTER, NEUMAN, and CADY, JJ., and HARRIS,* S.J.

---

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

CADY, Justice.

This case concerns the responsibility of a petroleum refiner and supplier under the Iowa Comprehensive Petroleum Underground Storage Tank Fund Act, Iowa Code chapter 455G (1997) (Tank Fund Act), for the corrective costs of the release of petroleum into the ground from an underground storage tank. The district court found the oil refiner and supplier was not responsible for the corrective costs as a matter of law, and granted summary judgment. We affirm.

## I. Background Facts and Proceedings.

Schroeder Oil Company owned and operated a gas station in Carroll, Iowa from 1974 to 1978. The station was operated under the Mobil trademark and sold Mobil gasoline. In 1978, Schroeder sold the station to Donald Kitt, who then leased the site back to Schroeder. Schroeder continued to display the Mobil trademark, accept Mobil gasoline credit cards, and have its employees wear Mobil uniforms.

Schroeder was known as a Mobil "jobber," an independent distributor of Mobil gasoline. It purchased gasoline from Mobil at Mobil's Omaha terminal, and distributed it to various Mobil stations, including the station it leased in Carroll. Schroeder placed the petroleum into underground storage tanks located at the station, which was then dispensed to customers through pumps.

Mobil had the ability to "debrand" a jobber's station, such as the Carroll station, by terminating its relationship with the Mobil branded station if the jobber placed another brand of gasoline into the underground storage tank, or if the jobber did not pay for the petroleum products purchased. Mobil also dictated the geographic territory in which a jobber could sell its gasoline.

A petroleum leak from the underground storage tank at Schroeder's Mobil station occurred in 1984. This leak, however, was not detected until 1988.

In 1990, Kitt applied to the Iowa Comprehensive Petroleum Underground Storage Tank Fund Board for statutory benefits under the Tank Fund Act to pay for the cost of clean up. His claim was approved, and the Board paid and will continue to pay, up to the statutory limit, for the corrective action costs incurred at the site. See Iowa Code § 455G.9(1).

In 1997, the Board filed a petition in district court against Mobil Oil seeking to recover the corrective action costs. Under the Tank Fund Act, the Board recovers corrective costs from the "owner, operator, or other potentially responsible party. . . ." Id. § 455G.13(1). The Board alleged Mobil was liable as an "operator."

Mobil moved for summary judgment. It claimed that its status as a wholesale supplier of gasoline to a distributor and the station's use of the Mobil trademark were insufficient as a matter of law to impose liability as an "operator" under the Tank Fund Act. Mobil did not own or lease the station, and had no franchise agreement with Schroeder.

The trial court granted summary judgment for Mobil. It interpreted the Tank Fund Act to exclude a wholesale supplier of petroleum who did not participate in the daily operations of the station, and found no facts to indicate Mobil participated in the daily operation of the underground storage tank.

The Board appealed. It claims the term "operator" under the Tank Fund Act must be broadly construed to include wholesalers who not only control the operation of the tank, but have the ability to control the tank. It claims Mobil maintained the ability to control the underground tank based on its authority to refuse to deliver gasoline to the distributor and to debrand a jobber station.

## II. Scope of Review.

We review a summary judgment ruling for errors at law. *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co.*, 568 N.W.2d 815, 817 (Iowa 1997). Summary judgment may be entered if the record shows "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Id.*; Iowa R. Civ. P. 237(c). Thus, we must determine whether a genuine issue of material fact exists and whether the court correctly applied the law. *See Schuver v. E.I. Du Pont de Nemours & Co.*, 546 N.W.2d 610, 612 (Iowa 1996). We view the facts in the light most favorable to the party opposing the motion for summary judgment. *Shriver v. City of Okoboji*, 567 N.W.2d 397, 400 (Iowa 1997). When the conflict in the record concerns only the legal consequences flowing from undisputed facts, entry of summary judgment is proper. *See Thompson v. City of Des Moines*, 564 N.W.2d 839, 841 (Iowa 1997).

Our review for issues involving statutory construction is for legal error. *Board of Trustees of Mun. Fire & Police Retirement Sys. v. City of West Des Moines*, 587 N.W.2d 227, 230 (Iowa 1998).

## III. Background of Tank Fund Act.

Like many other states, Iowa has enacted a comprehensive law regulating petroleum underground storage tanks, including the prevention and remediation of contamination from underground tanks. *See Hagen v. Texaco Ref. & Mktg., Inc.*, 526 N.W.2d 531, 535 (Iowa 1995); 1989 Iowa Acts ch. 131, §§ 1, 2; *see also* William B. Johnson, Annotation, *State & Local Government Control of Pollution From Underground Storage Tanks*, 11 A.L.R.5th 388, 388, 399 (1993). The law is commonly referred to as the Tank Fund Act, and followed the enactment of comprehensive federal regulations designed to address the growing problem created by a variety of hazardous wastes, including petroleum storage. *See* Comprehensive Environmental Responsibility, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601–9675 (1995) (enacted in 1980); Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901–6992k (enacted in 1976). The storage tank legislation was largely a response to threats posed to the quality of our groundwater from leaks in underground tanks containing petroleum. In 1988, for example, the United States Environmental Protection Agency reported there were over two million underground storage tanks located in over 700,000 facilities nationwide, and ten to thirty percent of the tanks had begun to leak or would soon leak if prompt action was not taken. William B. Johnson, Annotation, *State & Local Government Control of Pollution From Underground Storage Tanks*, 11 A.L.R.5th 388, 399 (1993) (citing Fed.Reg. 37082, at 37095–96 (Sept. 23 1988)). Most of the leaks have resulted from corrosion to the tanks. The problem was identified as a leading threat of groundwater pollution. *Id.*[1]

These types of findings set the groundwork for Iowa's Tank Fund Act. 1989 Iowa Acts ch. 131, § 1. In enacting the Tank Fund Act, our legislature found that the maintenance of Iowa's petroleum distribution system was dependent upon financial assistance to clean up past and existing petroleum spills, and that petroleum storage in underground tanks endangered groundwater and was a threat to the public health and welfare. *Id.* Consequently, the Tank Fund Act established the Iowa Comprehensive Petroleum Underground Tank Storage Fund which is administered

---

1. Groundwater supplies approximately eighty percent of all Iowans' drinking water. U.S. Environmental Protection Agency, *National Water Quality Inventory: 1996 Report to Congress*, 99 (1998). The Environmental Protection Agency estimates that sixty percent of underground storage tank leaks have impacted groundwater quality nationwide. *Id.* at 111. Leaks in underground storage tanks contaminate groundwater with petroleum compounds such as benzene, which is a human carcinogen. *Id.*

by the Board. Iowa Code §§ 455G.3, .4. The purpose of the fund is to assist owners and operators of underground storage tanks in complying with federal technical and financial responsibility regulations, and to protect and improve the quality of Iowa's environment. *Id.* § 455G.3(2); *see* 1989 Iowa Acts ch. 131, § 2. One way the fund assists owners and operators is in financing "corrective actions." *See* Iowa Code §§ 455G.3(3)(a), .9. Revenue for the fund includes bonds, taxes, fees, insurance premiums, and recoveries from persons liable for petroleum releases. *Id.* § 455G.8.

Chapter 455G also established the framework for the Board to recover moneys expended for corrective action costs. *See id.* § 455G.13. In general, the Board is required to recover the full cost of the corrective action from "the owner, operator, or other potentially responsible party." *Id.* § 455G.13(1).[2] The Board does not claim Mobil is liable as a "owner" or "other potentially responsible party" but is strictly liable as an "operator." *See id.* § 455G.13(7). Thus, the resolution of this case turns on the meaning of "operator."

## IV. Summary Judgment.

### A. Legislative Intent.

Although the Tank Fund Act does not include a definition of "operator," the term is defined in a companion statute as "a person in control of, or having responsibility for, the daily operation of the underground storage tank." *Id.* § 455B.471(5). The companion statute defines the regulatory responsibility of the Iowa Department of Natural Resources over underground storage tanks, and is properly read in *pari materia* with chapter 455B. *See id.* § 455G.16 (Board shall cooperate with Department of Natural Resources in implementing chapter 455G). Thus, our legislature has specifically defined an "operator." Nevertheless, the terms "control," "responsibility," and "daily operation" within the definition are not further defined by the statute, and this lack of a definition forms the basis for the dispute presented on appeal. It is our function to examine the history and language of the Tank Fund Act to discern the intent of our legislature. *Hamilton v. City of Urbandale*, 291 N.W.2d 15, 19 (Iowa 1980).

■ In interpreting the statute, our ultimate goal is to ascertain and give effect to the intent of the legislature. *Iowa Federation of Labor AFL–CIO v. Iowa Dep't of Job Serv.*, 427 N.W.2d 443, 445 (Iowa 1988). We look to both the language and the purpose behind the statute. *Wilkins v. State*, 522 N.W.2d 822, 823 (Iowa 1994). Yet, when the language is plain and unambiguous, we do not look beyond the statute for its meaning and do not engage in further construction. *Iowa West Racing Ass'n v. Iowa Racing & Gaming Comm'n*, 546 N.W.2d 898, 900 (Iowa 1996). Thus, we give the words their plain and ordinary meaning when not specifically defined by the legislature or when there is no particular legal definition of the term. *State v. Jones*, 524 N.W.2d 172, 174 (Iowa 1994). A dictionary is an acceptable method to ascertain the meaning of the language of the statute. *Id.*

### B. Existence of Ambiguity.

■ Mobil claims the statute is plain and unambiguous because the legislature specifically tied "control" and "responsibility" to the "daily operation" of the tank. It argues the statute excludes entities who merely supply petroleum to a distributor,

**2.** Iowa Code section 455G.13(1) provides:

*Full recovery sought from owner.* The board shall seek full recovery from the owner, operator, or other potentially responsible party liable for the released petroleum which is the subject of a corrective action, for which the fund expends moneys for corrective action or third-party liability, and for all other costs, including reasonable attorney fees and costs of litigation for which moneys are expended by the fund in connection with the release. When federal clean up funds are recovered, the funds are to be deposited to the remedial account of the fund and used solely for the purpose of future clean up activities.

and only applies to hands-on, on-site participation in the operation of a tank. The Board asserts the undefined terms are ambiguous and includes those who have the ability to control the daily operation of the tank by terminating the supply of gasoline. An ambiguity exists in a statute when reasonable minds differ over the meaning of a word or phrase. *State v. O'Malley*, 593 N.W.2d 517, 518 (Iowa 1999).

We recognize the ordinary dictionary definition of "control" not only includes the exercise of restraint or influence, but the power or authority to regulate or manage. *See* Merriam–Webster's Collegiate Dictionary 252 (10th ed.1998). Moreover, responsibility means both to be liable to account as the cause and to answer for conduct or obligations. *See id.* at 998. Thus, the words "control" and "responsibility" do not themselves exclude the interpretation by the Board that the authority to control is included within the definition.

Nevertheless, "control of, and responsibility for" is limited by the statute to the "daily operation" of the tank. This implies some continuous level of activity, and would exclude infrequent or isolated activity such as repairs. *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 972–73 (Ind.1998). The typical activities associated with the actual operation of underground gasoline storage tanks have been identified as filling and testing the tank, and measuring and dispensing its contents. *Id.* The statute clearly defines an "operator" in terms of what is being operated. *Id.*

Although Mobil does not participate in the on-site daily operation of the tank, the Board asserts Mobil is in "control" of the daily operation through its authority to discontinue the supply of gasoline and debrand a jobber's station. The question is whether our legislature intended "control" and "responsibility" to include the type of control maintained by Mobil in this case.

### C.  Purpose of Tank Fund Act.

The Board claims its broad interpretation is derived from the goal and purpose of the statute, "to provide adequate and reliable financial assurance for the cost of corrective action for preexisting petroleum underground storage tank releases." 1989 Iowa Acts ch. 131, § 2; *see Hagen*, 526 N.W.2d at 543. It argues this goal will not be met if petroleum suppliers like Mobil are excluded from liability. The Board also argues the history of the companion federal CERCLA and RCRA legislation supports the conclusion that Mobil was an "operator" under our Iowa statute.

In determining legislative intent, we not only look to the language of the statute, but the objects sought to be accomplished, the purpose served, the underlying policies, the remedies, and the consequences of the various interpretations. *United Fire & Cas. Co. v. Acker*, 541 N.W.2d 517, 519 (Iowa 1995). We agree a goal of our Iowa statute is to provide financial assurance for the clean up costs of petroleum release from underground storage tanks. Yet, this goal does not express a further intent to define the particular means of financing the clean up. There are a variety of possible sources to finance clean up of petroleum releases, and the imposition of the clean up costs on those who supplied the petroleum is one approach. For example, in enacting CERCLA to deal with the clean up of hazardous waste sites, Congress specifically imposed liability on those who supplied the pollutants to the site. *See* 42 U.S.C. § 9607(a)(3). It envisioned that the clean up costs would be recouped from those responsible for the problem, and the taxpayers would not be required to shoulder the financial burden. *See United States v. Witco Corp.*, 865 F.Supp. 245, 247 (E.D.Pa. 1994). Similarly, after leaded gasoline became an environmental concern, Congress responded to the problem by making refiners and suppliers liable for their branded stations who failed to comply with the ban imposed on the sale of leaded gas. 42 U.S.C. § 7545(n).

■ Our legislature, however, specified six sources of revenue for the fund, including issuance of bonds, use tax revenue, storage tank management fees, insurance premium income, proceeds from cost recovery enforcement, and other sources of revenue intended for the fund. Iowa Code § 455G.8. Our legislature made no direct reference to suppliers or refiners as a source of cost recovery. If anything, the six sources identified by our legislature reveal an intent for the cost to be shared from a variety of sources. There is no indication refiners and suppliers were a target of the financial scheme. It may be an acceptable public policy to look to those who are best able to pay for the clean up, but we are not free to adopt a particular policy not supported by the language or history of a statute. *See Stroup v. Reno,* 530 N.W.2d 441, 443 (Iowa 1995).

### D. Legislative History.

■ Legislative history is properly considered in interpreting statutory language found to be ambiguous. *State v. McSorley,* 549 N.W.2d 807, 809 (Iowa 1996). The problem, however, is that an extensive history of our Iowa statute is not readily available. The published legislative findings did express a need to provide a reasonable means to share remediation costs, but there were no specific findings to include petroleum suppliers. *See* 1989 Iowa Acts ch. 131, § 1. Nevertheless, the Tank Fund Act does share some similarity with the predicate federal legislation, which includes an extensive published legislative history. Yet, we have reviewed the federal legislation and find it provides little guidance in our interpretation of our statute. CERCLA is not applicable to petroleum products, and provides no meaningful definition of owner or operator. 42 U.S.C. § 9601(33); *United States v. Bestfoods,* 524 U.S. 51, 56, 118 S.Ct. 1876, 1882, 141 L.Ed.2d 43, 53 (1998). Although RCRA contains the same definition of operator as found in our Iowa statute, the federal courts have not addressed the definition in the context of the issue we face. *See* 42

U.S.C. § 6991(4); *Meyer,* 705 N.E.2d at 973.

### E. Related Provisions.

The Board argues other provisions in the statute reveal a legislative intent for oil companies who operate through the jobber system to be included within the definition of an operator. First, it asserts section 455G.13(2)(a), which places limits on cost recovery against a fund claimant, implies the legislature intended to permit cost recovery against oil companies, like Mobil, because there would otherwise be few remaining entities available to seek cost recovery. Second, it argues section 455G.13(8), which renders agreements to shift liability to an owner or operator eligible for fund assistance void, also reveals an intent to make oil producers liable. Finally, it claims the "lender" exception to the definition of "owner" under section 455B.471(6)(b) shows the legislature intended to include other such entities, like oil companies, who do not participate in the direct operation of a tank.

■ In construing a statute, we consider all parts of the enactment together. *Mortensen v. Heritage Mut. Ins. Co.,* 590 N.W.2d 35, 39 (Iowa 1999). However, our goal remains to find the legislative intent, and we must not under the guise of construction extend terms or change terms of the statute. *State v. Vietor,* 208 N.W.2d 894, 898 (Iowa 1973), *overruled on other grounds by, State v. Monroe,* 236 N.W.2d 24, 33 (Iowa 1975).

The companion statutes cited by the Board provide little assistance in our search for the intent of the legislature. Although the Tank Fund Act permits only limited recovery against a claimant and voids indemnity agreements, it is conjecture to conclude these provisions reveal an intent to make oil producers liable. Moreover, the lender exception was placed in the Act to be "consistent with [RCRA]." Iowa Code § 455B.471(6)(b). Yet, Congress enacted the lender exception after

federal court decisions began to impose lender liability under certain circumstances. *See United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1555–56 (11th Cir.1990). Thus, the exemption was most likely unrelated to an expression of intent to include oil companies within the Act, but was a legislative response to specific judicial interpretations finding lenders to be owners.

### F. Legal Definition.

In determining legislative intent we look not only to the ordinary meaning of words, but particular meaning in the law. *State v. White*, 563 N.W.2d 615, 617 (Iowa 1997). We endeavor to construe statutory language consistent with case law. *Sourbier v. State*, 498 N.W.2d 720, 723 (Iowa 1993).

The Board asserts that the legislature intended the phrase "control of" and "responsible for" to include off-site entities who maintain control of the on-site operations of the tank through the ability to terminate a supply of gasoline and debrand a station for using another brand of gasoline or failing to pay for the gasoline. Thus, the Board asserts the definition of "operator" includes an oil refiner or supplier based on its relationship with the on-site operator of the tank.

When our case law uses the word "control" in the context suggested by the Board, we not only consider the actual exercise of control but the right or authority to control. *See LaFleur v. LaFleur*, 452 N.W.2d 406, 408 (Iowa 1990). Yet, our cases define the right to control to mean the right to control the means of performance, not the end result of the performance. *Daggett v. Nebraska E. Express, Inc.*, 252 Iowa 341, 348, 107 N.W.2d 102, 107 (1961); 41 Am.Jur.2d *Independent Contractor* § 12, at 409 (1995). A person who employs another person necessarily reserves some degree of control to ensure the work is done according to the plan, without exercising the type of control that results in liability. *See Hassebroch v.*

*Weaver Constr. Co.*, 246 Iowa 622, 632, 67 N.W.2d 549, 555 (1954). Thus, the control which relates to authority to terminate the relationship when certain basic conditions are not met, such as unsatisfactory performance, is not the type of control which gives rise to liability. *See Teeters v. City of Des Moines*, 173 Iowa 473, 483, 154 N.W. 317, 320 (1915).

We believe our legislature had this same concept of "control" in mind in defining an "operator" under the Tank Fund Act. The statute specifically ties the "control" and "responsibility" to the "daily operation" of the tank, and the control exercised by Mobil was far removed from the "daily operation" of the tank. Instead, it related to circumstances that were fundamental to its business relationship with all distributors and retail sellers of its gasoline. The control retained by Mobil did not pertain to the daily operation of a tank system, but the integrity of the product name for the protection of all other Mobil trademark stations. This type of control does not impose vicarious liability in the law.

### G. Other Cases.

We also believe an interpretation that excludes Mobil from the definition of "operator" under the facts of this case is consistent with our cases which have refused to impose vicarious liability on an oil company for an activity which occurs at a gas station based upon the use of the oil company's trademark sign at the service station. *See Reynolds v. Skelly Oil Co.*, 227 Iowa 163, 171, 287 N.W. 823, 827 (1939). Additionally, we give weight to judicial interpretations of similar statutes in other jurisdictions. *Barker's Inc. v. B.D.J. Dev. Co.*, 308 N.W.2d 78, 82 (Iowa 1981). The Indiana Supreme Court recently tackled the issue we face, based on an action under its Underground Storage Tank Act that includes the same definition of "operator" as our Iowa statute. *See Meyer*, 705 N.E.2d at 962. In holding that the supplier was not liable, the court said:

Where the chain of responsibility between a refiner and the individual charged with the daily operations of the tank is interrupted by the existence of a jobber, at least on the facts in this record, there is no "control" or "responsibility" on the part of the Oil Company within the meaning of the Act simply by virtue of the refiner's ability to exert practical leverage over the jobber and independently owned station by refusing to sell to it. However, where there is no jobber in the chain of responsibility or some other set of facts creates derivative liability for an operator's actions, the refiner may be liable under the Act.

*Id.* at 978.

Our interpretation of the Tank Fund Act convinces us that our legislature did not intend to include oil refiners who sell gasoline to independent distributors within the definition of an operator based solely on their ability to stop selling gasoline or to exert leverage over a station by denying use of the trademark.

### V. Conclusion.

The district court did not err in granting Mobil's motion for summary judgment.

**AFFIRMED.**