**ST. ANSGAR MILLS, INC., Appellant,**

v.

**Duane J. STREIT, Appellee.**

No. 98–2025.

Supreme Court of Iowa.

July 6, 2000.

Richard K. Updegraff of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, for appellant.

A. Eric Neu of Neu, Minnich, Comito & Hall, P.C., Carroll, for appellee.

CADY, Justice.

A grain dealer appeals from an order by the district court granting summary judgment in an action to enforce an oral contract for the sale of corn based on a written confirmation. The district court held the oral contract was unenforceable because the written confirmation was not

delivered within a reasonable time after the oral contract as a matter of law. We reverse the decision of the district court and remand for further proceedings.

## I. Background Facts and Proceedings.

St. Ansgar Mills, Inc. is a family-owned agricultural business located in Mitchell County. As a part of its business, St. Ansgar Mills buys corn from local grain farmers and sells corn to livestock farmers for feed. The price of the corn sold to farmers is established by trades made on the Chicago Board of Trade for delivery with reference to five contract months. The sale of corn for future delivery is hedged by St. Ansgar Mills through an offsetting futures position on the Chicago Board of Trade.

A sale is typically made when a farmer calls St. Ansgar Mills and requests a quote for a cash price of grain for future delivery based on the Chicago Board of Trade price for the delivery.[1] The farmer then accepts or rejects the price. If the price is accepted, St. Ansgar Mills protects the price through a licensed brokerage house by acquiring a hedge position on the Chicago Board of Trade. This hedge position, however, obligates St. Ansgar Mills to purchase the corn at the stated price at the time of delivery. Thus, St. Ansgar Mills relies on the farmer who purchased the grain to accept delivery at the agreed price.

Duane Streit formerly resided in Mitchell County and currently practices veterinarian medicine in Carroll County. He also raises hogs. He owns a large hog farrowing operation in Carroll County and a hog finishing operation in Mitchell County near Osage. Streit purchased the Os-age farm from his father in 1993. Duane's father, John Streit, resides in Mitchell County and helps Duane operate the Osage finishing facility.

Duane and his father have been long-time customers of St. Ansgar Mills. Since 1989, Duane entered into numerous contracts with St. Ansgar Mills for the purchase of large quantities of corn and other grain products. Duane would generally initiate the purchase agreement by calling St. Ansgar Mills on the telephone to obtain a price quote. If an oral contract was made, an employee of St. Ansgar Mills would prepare a written confirmation of the sale and either mail it to Duane to sign and return, or wait for Duane or John to sign the confirmation when they would stop into the business.

John would regularly stop by St. Ansgar Mills sometime during the first ten days of each month and pay the amount of the open account Duane maintained at St. Ansgar Mills for the purchase of supplies and other materials. On those occasions when St. Ansgar Mills sent the written confirmation to Duane, it was not unusual for Duane to fail to sign the confirmation for a long period of time. He also failed to return contracts sent to him. Nevertheless, Duane had never refused delivery of grain he purchased by telephone prior to the incident which gave rise to this case.

On July 1, 1996, John telephoned St. Ansgar Mills to place two orders for the purchase of 60,000 bushels of corn for delivery in December 1996 and May 1997. This order followed an earlier conversation between Duane and St. Ansgar Mills. After the order was placed, St. Ansgar Mills completed the written confirmation but set it aside for John to sign when he was expected to stop by the business to pay the open account. The agreed price of the December corn was $3.53 per bushel. The

---

1. This is not the exclusive method of sale. Another type of sale is based on an order contingent upon the cash price of the corn reaching a specific level. This type of sale, however, was not involved in this case.

price of the May corn was $3.73 per bushel.

John failed to follow his monthly routine of stopping by the business during the month of July. St. Ansgar Mills then asked a local banker who was expected to see John to have John stop into the business.

John did not stop by St. Ansgar Mills until August 10, 1996. On that date, St. Ansgar Mills delivered the written confirmation to him.

Duane later refused delivery of the corn orally purchased on July 1, 1996. The price of corn had started to decline shortly after July 1, and eventually plummeted well below the quoted price on July 1. After Duane refused delivery of the corn, he purchased corn for his hog operations on the open market at prices well below the contract prices of July 1. St. Ansgar Mills later told Duane it should have followed up earlier with the written confirmation and had no excuse for not doing so.

St. Ansgar Mills then brought this action for breach of contract. It sought damages of $152,100, which was the difference between the contract price of the corn and the market price at the time Duane refused delivery.

Duane filed a motion for summary judgment. He claimed the oral contract alleged by St. Ansgar Mills was governed by the provisions of the Uniform Commercial Code, and was unenforceable as a matter of law under the statute of frauds. He claimed the written confirmation delivered to John on August 10, 1996 did not satisfy the statute of frauds for two reasons. First, he was not a merchant. Second, the confirmation was not received within a reasonable time after the alleged oral agreement.

The district court determined a jury question was presented on whether Duane was a merchant under the Uniform Com-

mercial Code. However, the district court found the written confirmation did not satisfy the writing requirements of the statute of frauds because the delivery of the confirmation to John, as Duane's agent, did not occur within a reasonable time after the oral contract as a matter of law. The district court found the size of the order, the volatility of the grain market, and the lack of an explanation by St. Ansgar Mills for failing to send the confirmation to Duane after John failed to stop by the business as expected made the delay between July 1 and August 10 unreasonable as a matter of law.

St. Ansgar Mills appeals. It claims a jury question was presented on the issue of whether a written confirmation was received within a reasonable time.[2]

## II. Scope of Review.

We review a ruling for summary judgment for errors at law. Iowa R.App. P. 4; *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Mobil Oil Corp.*, 606 N.W.2d 359, 362 (Iowa 2000). Summary judgment is appropriate where the record indicates no genuine issue of material fact exists, therefore the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 237(c). When the facts are not in dispute, we decide whether the district court correctly applied the law to the facts. *Kennedy v. Zimmermann*, 601 N.W.2d 61, 64 (Iowa 1999). In doing so, we view the facts in the light most favorable to the party opposing the motion. *See Mobil*, 606 N.W.2d at 362.

## III. Statute of Frauds.

The statute of frauds is one of the most well-known and venerable rules applicable to contract law. Generally, it establishes an exception to the proposition that oral contracts are enforceable in a lawsuit if

---

**2.** Duane did not cross-appeal from the determination by the district court that his status as a merchant was a question for the fact finder. Therefore, the issue is not before us.

We limit our review to the issue whether a forty-day delay between the claimed oral contract and receipt of a written confirmation was unreasonable as a matter of law.

sufficiently proven by requiring certain types of contracts to be in writing and signed by the party against whom enforcement is sought. *See* Iowa Code § 554.2201(1).

The statute of frauds originated in 17th century England to combat the use of fraud and perjury by litigants in court proceedings to establish oral contracts. *See* 2 E. Allan Farnsworth, *Contracts* § 6.1, at 82–83 (2d ed.1990). At the time, court rules prohibited parties to a lawsuit from testifying as witnesses in their case, and, consequently, an oral contract could only be established with testimony of third parties. *See Azevedo v. Minister*, 86 Nev. 576, 471 P.2d 661, 663 (1970). This prohibition allowed witnesses to be persuaded to give false testimony on behalf of a party in an effort to establish an oral contract, leaving the other party at a distinct disadvantage. *See* James J. O'Connell, Jr., *Boats Against a Current: The Courts and the Statute of Frauds*, 47 Emory L.J. 253, 257 (1998) [hereinafter O'Connell].[3]

In 1677, in response to this unsavory practice of using perjury to establish oral contracts, Parliament enacted the statute of frauds to require certain contracts to be supported by written evidence to be enforceable.[4] 29 Car. 2, ch. 3 (1677) (Eng.); *see* Hugh E. Willis, *Statute of Frauds—A Legal Anachronism*, 3 Ind. L.J. 427, 427 (1928). The statute included contracts which were not only particularly susceptible to fraud, but those which posed serious consequences of fraud, including contracts for the sale of goods or property. *See* O'Connell, 47 Emory L.J. at 258.

Despite a difference in the court rules which gave rise to this statute of frauds, our American legal culture quickly adopted the principle. James J. White & Robert S. Summers, *Uniform Commercial Code* § 2—1, at 50 (2d ed.1980) [hereinafter White & Summers]. Iowa adopted the statute of frauds in 1851. *See* Iowa Code §§ 2409–10 (1851). The statute of frauds also became a part of the Uniform Sales Act in 1906, which Iowa subsequently adopted in 1924. *See* 1919 Iowa Acts ch. 396 (initially codified at Iowa Code §§ 9930–10007 (1924)). This statute required all contracts for the sale of goods to be in writing. Over time, the Uniform Sales Act was replaced by the Uniform Commercial Code.[5] The Uniform Commercial Code continued to adhere to the stat-

---

**3.** Other factors also helped place defendants at a distinct disadvantage. Rules of evidence were undeveloped at the time and courts had little authority to overturn jury verdicts not supported by the evidence. *See* O'Connell, 47 Emory L.J. at 257.

**4.** There is some debate as to the date of passage with royal assent for the new bill. Some records indicate the date of passage as April 16, 1676, whereas the actual date was in 1677. *Compare* Marc P. Bouret, *Oral Will Contracts and the Statute of Frauds in California, 1896–1980: A Summary and Evaluation*, 8 Pepp. L.Rev. 41, 43 (1980) (arguing the statute of frauds was originally enacted in 1676), *with* George P. Costigan, Jr., *The Date and Authorship of the Statute of Frauds*, 26 Harv. L.Rev. 329, 331 (1913) [hereinafter Costigan] (arguing the statute was enacted in 1677). The confusion stems from Pope Gregory XIII's abolition of the "old" calendar in 1582, which was adopted in England in 1751. Costigan, 26 Harv. L.Rev. at 331. The "old" calendar was 11 days ahead of the "new" due to the vernal equinox in March, resulting in confusion in the months of January, February and March. *Id.*

**5.** After six years of deliberating, the National Conference of Commissioners on Uniform State Laws produced the 1952 Official Text of the Uniform Commercial Code. *See* William A. Schnader, *A Short History of the Preparation and Enactment of the Uniform Commercial Code*, 22 U. Miami L.Rev. 1, 1–2 (1967). In 1954, Pennsylvania was the first state to formally adopt the text. *See* 13 Pa. Const. Stat. §§ 1101 to 9507 (1953). By 1968, the Uniform Commercial Code was effective in 49 states, the District of Columbia, and the Virgin Islands. *See* Uniform Commercial Code Table, 1 U.L.A. 1–2 (Master ed.1989). There have been three official revisions, the 1972, the 1978, and the 1987 Official Texts, offered by the Permanent Editorial Board, a board established in 1961 to keep the Code up to date. *See* William A. Schnader, *The Permanent Editorial Board for the Uniform Commercial Code: Can it Accomplish its Object?*, 3 Am. Bus. L.J. 137, 138 (1965).

ute of frauds, but was limited in its provisions to the sale of goods in excess of $500. Iowa enacted its version of the Uniform Commercial Code in 1966 including the statute of frauds. *See* 1965 Iowa Acts ch. 413. Iowa's statute of frauds for the sale of goods now provides:

> Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforced by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by that party's authorized agent or broker.

Iowa Code § 554.2201(1) (1995).

Although the statute of frauds has been deeply engrained into our law, many of the forces which originally gave rise to the rule are no longer prevalent. White & Summers § 2—1, at 51. This, in turn, has caused some of the rigid requirements of the rule to be modified.

■ One statutory exception or modification to the statute of frauds which has surfaced applies to merchants.[6] *Id.* § 554.2201(2). Under section 554.2201(2), the writing requirements of section 554.2201(1) are considered to be satisfied if, within a reasonable time, a writing in confirmation of the contract which is sufficient against the sender is received and the merchant receiving it has reason to know of its contents, unless written notice of objection of its contents is given within ten days after receipt. *Id.* Thus, a writing is still required, but it does not need to be signed by the party against whom the

contract is sought to be enforced. The purpose of this exception was to put professional buyers and sellers on equal footing by changing the former law under which a party who received a written confirmation of an oral agreement of sale, but who had not signed anything, could hold the other party to a contract without being bound. *See* White & Summers § 2—3, at 55; *Kimball County Grain Coop. v. Yung*, 200 Neb. 233, 263 N.W.2d 818, 820 (1978). It also encourages the common, prudent business practice of sending memoranda to confirm oral agreements. White & Summers § 2—3, at 55.

While the written confirmation exception imposes a specific ten-day requirement for a merchant to object to a written confirmation, it employs a flexible standard of reasonableness to establish the time in which the confirmation must be received. Iowa Code § 554.2201(2). The Uniform Commercial Code specifically defines a reasonable time for taking action in relationship to "the nature, purpose and circumstances" of the action. *Id.* § 554.1204(2). Additionally, the declared purpose of the Uniform Commercial Code is to permit the expansion of commercial practices through the custom and practice of the parties. *See* Iowa Code Ann. § 554.1102 cmt. 2 (course of dealings, usage of trade or course of performance are material in determining a reasonable time). Furthermore, the Uniform Commercial Code relies upon course of dealings between the parties to help interpret their conduct. Iowa Code § 554.1205(1). Thus, all relevant circumstances, including custom and practice of the parties, must be considered in deter-

---

**6.** The Uniform Commercial Code establishes three general exceptions to the writing requirement: (1) goods made specially for the buyer and not suitable for resale to others towards which the seller has made a substantial beginning of their manufacture or commitments for their procurement; (2) where the party against whom enforcement is sought admits the existence of the contract in pleadings, testimony, or before the court; and (3) goods for which payment has been received

and goods accepted. *See* Iowa Code § 554.2201(3)(a)-(c). Additionally, a contract "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of the contract." *Id.* § 554.2204(1). The agreement which creates the contract qualifies even though the exact moment of its making is undetermined or terms are left open, so long as the parties intended to make a contract. *Id.* § 554.2204(2), (3).

mining what constitutes a reasonable time under section 554.2201(2).

■ Generally, the determination of the reasonableness of particular conduct is a jury question. *See Pirelli–Armstrong Tire Co. v. Reynolds,* 562 N.W.2d 433, 436 (Iowa 1997); *see also Harvey v. Great Atl. & Pac. Tea Co.,* 388 F.2d 123, 125 (5th Cir.1968) (passing judgment on the reasonableness of conduct of the parties must be accomplished in light of all the circumstances of the case and should rarely be disposed of by summary judgment). Thus, the reasonableness of time between an oral contract and a subsequent written confirmation is ordinarily a question of fact for the jury. *Mortgageamerica Corp. v. American Nat'l Bank,* 651 S.W.2d 851, 856 (Tex.Ct.App.1983); *Schiavi Mobile Homes, Inc. v. Gagne,* 510 A.2d 236, 238 (Me.1986) (reasonableness of parties' time for action is a question of fact). It is only in rare cases that a determination of the reasonableness of conduct should be decided by summary adjudication. *Harvey,* 388 F.2d at 125. Summary judgment is appropriate only when the evidence is so one-sided that a party must prevail at trial as a matter of law. *Ridgeway v. Union County Comm'rs,* 775 F.Supp. 1105, 1109 (S.D.Ohio 1991).

There are a host of cases from other jurisdictions which have considered the question of what constitutes a reasonable time under the written confirmation exception of the Uniform Commercial Code. *See Gestetner Corp. v. Case Equip. Co.,* 815 F.2d 806, 810 (1st Cir.1987) (roughly five month delay reasonable in light of merchants' relationship and parties' immediate action under contract following oral agreement); *Serna, Inc. v. Harman,* 742 F.2d 186, 189 (5th Cir.1984) (three and one-half month delay reasonable in light of the parties' interaction in the interim, and nonfluctuating prices, thus no prejudice); *Cargill, Inc. v. Stafford,* 553 F.2d 1222, 1224 (10th Cir.1977) (less than one month delay unreasonable despite misdirection of confirmation due to mistaken addressing);

*Starry Constr. Co. v. Murphy Oil USA, Inc.,* 785 F.Supp. 1356, 1362–63 (D.Minn. 1992) (six month delay for confirmation of modification order for additional oil unreasonable as a matter of law in light of Persian Gulf War, thus increased prices and demand); *Rockland Indus., Inc. v. Frank Kasmir Assoc.,* 470 F.Supp. 1176, 1179 (N.D.Tex.1979) (letter sent eight months after alleged oral agreement for two-year continuity agreement unreasonable in light of lack of evidence supporting reasonableness of delay); *Yung,* 263 N.W.2d at 820 (six month delay in confirming oral agreement delivered one day prior to last possible day of delivery unreasonable); *Azevedo,* 471 P.2d at 666 (ten week delay reasonable in light of immediate performance by both parties following oral agreement); *Lish v. Compton,* 547 P.2d 223, 226–27 (Utah 1976) (twelve day delay "outside the ambit which fair-minded persons could conclude to be reasonable" in light of volatile price market and lack of excuse for delay other than casual delay). Most of these cases, however, were decided after a trial on the merits and cannot be used to establish a standard or time period as a matter of law. Only a few courts have decided the question as a matter of law under the facts of the case. *Compare Starry,* 785 F.Supp. at 1362–63 (granting summary judgment), *and Lish,* 547 P.2d at 226–27 (removing claim from jury's consideration), *with Barron v. Edwards,* 45 Mich.App. 210, 206 N.W.2d 508, 511 (1973) (remanding for further development of facts, summary judgment improper). However, these cases do not establish a strict principle to apply in this case. The resolution of each case depends upon the particular facts and circumstances.

■ In this case, the district court relied upon the large amount of the sale, volatile market conditions, and lack of an explanation by St. Ansgar Mills for failing to send the written confirmation to Duane in determining St. Ansgar Mills acted unreasonably as a matter of law in delaying delivery of the written confirmation until

August 10, 1996. Volatile market conditions, combined with a large sale price, would normally narrow the window of reasonable time under section 554.2201(2). However, they are not the only factors to consider. Other relevant factors which must also be considered in this case reveal the parties had developed a custom or practice to delay delivery of the confirmation. The parties also maintained a long-time amicable business relationship and had engaged in many other similar business transactions without incident. There is also evidence to infer St. Ansgar Mills did not suspect John's failure to follow his customary practice in July of stopping by the business was a concern at the time. These factors reveal a genuine dispute over the reasonableness of the delay in delivering the written confirmation, and make the resolution of the issue appropriate for the jury. Moreover, conduct is not rendered unreasonable solely because the acting party had no particular explanation for not pursuing different conduct, or re- gretted not pursuing different conduct in retrospect. The reasonableness of conduct is determined by the facts and circumstances existing at the time.

Considering our principles governing summary adjudication and the need to resolve the legal issue by considering the particular facts and circumstances of each case, we conclude the trial court erred by granting summary judgment. We reverse and remand the case for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except NEUMAN, J., who takes no part.