GRACE LABEL, INC., Plaintiff,

v.

Steve KLIFF, individually and d/b/a
Steve Kliff & Associates,
Defendant.

Steve Kliff, individually and d/b/a Steve
Kliff & Associates, Counterclaim
Plaintiff,

v.

Grace Label, Inc., Counterclaim
Defendant.

No. 4:02–CV–30538–RAW.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 25, 2005.

Sean P. Moore, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Retchen Witte Kraemer (Null) Kevin M. Reynolds, Robert L. Fanter, Whitfield & Eddy PLC, Des Moines, IA, for Plaintiff.

Kevin M. Reynolds, Robert L. Fanter, Gretchen Witte Kraemer, Whitfield & Eddy PLC, Richard J. Sapp, Nyemaster Goode Voights West Hansell & O'Brien PC, Des Moines, IA, for Defendant.

RULING ON MOTION FOR SUMMARY JUDGMENT OF DEFENDANT/COUNTERCLAIM PLAINTIFF STEVE KLIFF

WALTERS, Chief United States Magistrate Judge.

The claims in this case are based on a contract for the purchase of at least 47,-250,000 foil trading cards bearing the likeness of pop music star Britney Spears. The Court has diversity jurisdiction. 28 U.S.C. § 1332(a)(1). Plaintiff Grace Label, Inc. (Grace Label) sues for money due. Defendant Steve Kliff (Kliff) maintains the cards were rightfully rejected as malodorous and otherwise not conforming to the contract requirement that they be "direct food contact compatible." He has counterclaimed for breach of contract. Kliff has moved for summary judgment on both the Complaint and his counterclaim (# 45). The matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(c)(1). The motion for summary judgment is fully submitted following hearing. The Court appreciates the careful attention both sides have paid to the requirements of LR 56.1 in preparing their summary judgment papers.

## I.

### SUMMARY JUDGMENT

Kliff is entitled to summary judgment if the affidavits, pleadings, and discovery materials "show that there is no genuine issue as to any material fact and that [Kliff is] entitled to judgment as a matter of law." *Erenberg v. Methodist Hospital*, 357 F.3d 787, 791 (8th Cir.2004) (citing Fed.R.Civ.P. 56(c)); *see LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098, 1100–01 (8th Cir.2005). The Court must view the facts in the light most favorable to Grace Label, and give it the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.*, 266 F.3d 884, 885–86 (8th Cir.2001) (citing *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir.2001)); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *John Q. Hammons Hotels, Inc. v. Acorn Window Systems, Inc.*, 394 F.3d 607, 609–10 (8th Cir.2005); *Erenberg*, 357 F.3d at 791; *Tademe v. St. Cloud State University*, 328 F.3d 982, 987 (8th Cir.2003). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Hartnagel*, 953 F.2d at 395 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Hitt v. Harsco Corp.*, 356 F.3d 920, 923 (8th Cir.2004).

In resisting summary judgment Grace Label must "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); *see Hesse v. Avis Rent A Car System, Inc.*, 394 F.3d 624, 628–29, 2005 WL 36541, *3 (8th Cir.2005); *Hitt*, 356 F.3d at 923. In assessing the motion for summary judgment the Court must determine whether a fair-minded trier of fact could reasonably find for Grace Label based on the evidence presented. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000).

## II.

## FACTUAL BACKGROUND

Except as noted, the following facts are either undisputed or are presented in the light most favorable to Grace Label.

Steve Kliff, a citizen of California, does business as Steve Kliff & Associates, a sole proprietorship he formed in 2002. He is in the business of brokering printing projects. On May 24, 2002, Barcel, S.A. de C.V. (Barcel), a Mexican company, by purchase order contracted with Kliff for at least 47,250,000 foil trading cards bearing the likeness of Britney Spears. Barcel is a large, multinational corporation which sells a variety of food products. It indicated the cards would be placed in snack food packaging and would come in direct contact with the food contents.

On May 30, 2002, Kliff by purchase order contracted with Grace Label to produce the Spears cards. Grace Label is an Iowa corporation located in Des Moines engaged in the business of manufacturing pressure-sensitive labels and flexible packaging. The purchase order described the product as a "Foil Trading Card (Direct Food Contact Compatible)." (Def.App. at 5). It also specified the printing process was to use "FDA Varnish." (Id.). In his affidavit Grace Label's president, Steve Grace, has said he understood Grace Label was to use FDA varnish to accomplish the direct food contact compatibility requirement. (Pltf.App. at 3). Grace Label did not have any direct communications with Barcel concerning the Spears cards. Kliff did not want Grace Label to be in contact with his customer.[1] (Id. at 18).

The Spears job was the third (or fourth) Barcel job Grace Label had worked on in association with Mr. Kliff in about a year's time. Grace Label relies heavily on the prior course of dealing between the parties for its contention that the Spears cards conformed to the contract specifications. Kliff disputes the admissibility of this evidence.

Before setting up his own company, Mr. Kliff was president of Chromium Graphics. The first Barcel job Grace Label worked on was in the summer and fall of 2001 when Kliff was still employed by Chromium Graphics, the "66 million job." (Pltf.App. at 22). According to Kliff the 66 million job involved two print orders of the same project which he refers to separately as the "Cupon Portatil job" and "Cupon Prendete job." (Def. Reply Stat. of Add. Facts ¶ 2). The Cupon Portatil job was placed with Grace Label by Kliff while employed at Chromium Graphics. (Def. Supp.App. at 134). The second part of the 66 million job, the Cupon Prendete job, essentially a re-order, came about in October–December 2001. Chromium Graphics had been sold and Kliff suggested Barcel work directly with Grace Label while he provided coordinating services. Ultimately he agreed to act as Grace Label's agent in dealing with Barcel. (Id. at 136).

The next job, just before the Spears job, was the "Ponte Sobre Ruedas job" in February 2002. Mr. Kliff had started his new company by then and contracted with Grace Label to produce the cards. (Def. Supp. at App. 136–37).

Despite its name, the 66 million job apparently involved in total about 58,000,000 "scratch off" game piece cards. Consumers scratched or rubbed off a coating to see if they had won a prize. (Def. Supp. App. at 49). The Ponte Sobre Ruedas job involved about 42,000,000 "peel apart" game piece cards. Consumers peeled off a top layer of the card to see if they had won

---

1. Kliff denies the lack of direct contact between Grace Label and Barcel. In an affidavit he states Barcel mailed the acceptance and authorization of proofs of the various Spears card images directly to Grace Label. (Def.App. at 137).

a prize. The Spears card was simply a trading card with no "scratch off" or "peel apart" feature. The purchase order to Grace Label for the Ponte Sobre Ruedas job, like the Spears job, specified the use of "FDA Varnish." The Spears card was varnished on both sides, the others on one side. The "direct food contact compatible" description appeared only in the Spears card purchase order. All of the cards manufactured by Grace Label for the various Barcel projects were inserted in packages of Barcel's snack food products. (Id.).

Mr. Grace has testified all of the printing jobs were based on material specifications originally given by Chromium Graphics to Grace Label for the 66 million job through its employee Barry McKillip[2] (Pltf.App. at 3, 7–8), and in fact Chromium Graphics supplied the material for that job. (Id. at 22). Mr. Grace further testified that over the course of several phone calls setting up the Spears job Mr. Kliff "described the application and he said, 'Let's do it similar to the last job that we printed for them.' I said, 'That's good. We'll use the same materials. That's great.' 'I'd like a prototype—or, I'd like a sample' ... I think we had discussions saying, 'We'll run it like we did the other jobs.'" (Id. at 13). Later in Mr. Grace's deposition the questioning returned to the subject: "[Kliff] said, 'I want a card just like we did.' I took that and said, 'Let's use the same material.' I didn't need to re-invent the wheel." (Id. at 20).

Beyond vendor invoices, Grace Label did not keep records of the materials used to produce the Spears cards, but Mr. Grace has testified the adhesive was "Rad–Cure 12PSFLV." (Id. at 9). Chromium Graphics, by Mr. McKillip, told Grace Labels to use the adhesive on the 66 million job. (Id. at 39). Rad–Cure 12PSFLV is not listed on the Rad–Cure website as being among Rad–Cure's FDA food grade adhesives. Grace Label was unaware whether or not this was the case. Other than ordering the FDA varnish, Grace Label did nothing to determine if the materials used to produce the Spears cards were compatible for direct contact with food items. (Def. Stat. of Facts ¶ 13; Pltf. Response ¶ 13). Before its work for Barcel, Grace Label had not produced a product intended to be in direct contact with food. (Pltf.App. at 7). Mr. Grace testified Grace Label assumed the materials Grace Label was told to use had been approved by Chromium Graphics or Barcel. (Id. at 89).

Grace Label prepared prototype cards which were transmitted to Barcel, through Kliff, for its approval. According to Mr. Grace, except for the foil (which is inert and has no odor), the prototype cards were produced with leftover material from the previous Barcel jobs. (Def.App. at 17–28). Barcel wanted to assure itself the cards would fit in Barcel's dispensing units. (Pltf.App. at 3). Mr. Grace has testified he was told Barcel was only testing for size and weight of the pieces and that was the purpose for the prototype cards. (Id. at 23–24). Barcel approved the prototype cards whereupon Grace Label proceeded with production.

Dr. Jennifer L. McPeak, a senior engineer at Exponent Failure Analysis Associates, Inc., retained by Kliff as an expert, has analyzed the Spears prototype and production cards, as well as Rad–Cure 12PSFLV control samples. She identifies the adhesive as the odor culprit. Dr. McPeak attributes the odor to a high level of beta-phenoxyethyl acrylate (BPA) present in the production cards, but undetectable in the prototype cards. (Def.App. at 39–42). She also found the concentration of BPA in the production cards far exceeded that in the Rad–Cure uncured and

cured control samples. (*Id.* at 41–42). She thus concluded the adhesive in the production cards was compositionally different than that used in the prototype cards and the Rad–Cure control samples.

Though Grace Label disputes the relevancy, Kliff's second expert, polymer chemist and complex printing processes and materials expert Randall D. Lewis states in his affidavit the FDA does not list BPA as a food grade qualified chemical acceptable for use in food products, and it is therefore "not direct food contact compatible and should not be used in conjunction with foods." (Def.App. at 36). Lewis has examined the production and prototype cards and noted the layers of the production cards separate more easily than the prototype cards indicating different adhesives were used, or the production cards were improperly cured, or both. (*Id.*).

On June 28, 2002 Grace Label shipped 17,138,000 production cards directly to Barcel. An additional 7,500,000 production cards were shipped to Barcel on July 5, 2002. Apparently Kliff was on the Grace Label premises during the first week of production and observed the cards being printed. He had many boxes of cards brought to him for inspection. Mr. Grace testified Kliff was "making sure that it looked right, printed right ... [h]e proofed the job." (Pltf.App. at 21). According to Grace, Kliff liked the cards and said they were what he wanted. He did not complain about an odor. (*Id.* at 25).

After receipt of the production cards, Barcel complained to Kliff that the cards emitted a foul odor and were not fit for use in the potato chip bags for which they were intended. Kliff told Grace Label he, too, noticed the odor, though, according to Mr. Grace, Kliff also told him he thought a lot of the odor had gone away and the cards would be okay. (Pltf.App. at 21). Grace Label suggested that the cards be "aired out" to eliminate the odor. Mr.

Kliff says Barcel attempted to air the cards out as suggested but the odor persisted. (Def.App. at 3). In his affidavit Mr. Grace states that the Spears production cards smelled the same as the cards for the other Barcel jobs Grace Label had printed and which had been accepted by Kliff and Barcel. (Pltf.App. at 4).

Mr. Kliff allegedly told Mr. Grace that apart from the odor there was a dispute between the Barcel marketing and purchasing departments concerning the cards, with the marketing department expecting a different type of job. (Pltf.App. at 19).

Barcel rejected the cards under its contract with Kliff before the final production was shipped from Grace Label. Kliff thereupon canceled the remaining order with Grace Label. Kliff has not paid Grace Label the contract amount for the cards beyond a $90,000 down payment.

### III.

### DISCUSSION

Kliff contends the Spears trading cards failed to conform to the contract evidenced by the purchase order in that they were (1) not "Direct Food Contact Compatible" because of their offensive odor and the use of adhesive containing BPA; and (2) materially different from the prototype cards. Grace Label responds (1) there are genuine issues of material fact about the odor and its incompatibility with a food product; (2) the cards conformed to the direct food contact compatibility requirement when that term is explained or supplemented by the course of dealing between the parties; and (3) the prototype cards were for the limited purpose of demonstrating size and weight. Further, Grace Label argues there are genuine issues of material fact concerning whether the production cards were accepted by Kliff, and if so, whether an effective revocation of acceptance was

made. First, however, Kliff presents a choice-of-law question.

*Choice of Law*

■ Kliff suggests that because the contract in question called for the manufacture of goods in the United States for delivery in Mexico it may be governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). The Court does not believe CISG is applicable. It expressly "applies to contracts of sale of goods between parties whose places of business are in different States," referring to different countries. 15 U.S.C.App., Art. 1(1). *See Asante Technologies, Inc. v. PMC–Sierra, Inc.*, 164 F.Supp.2d 1142, 1147 n. 4 (N.D.Cal.2001). The contract in this case was solely between two United States concerns with places of business in the United States. It provided for the shipment of the goods to Barcel in Mexico, but Barcel was not a party to the contract.

■ As a contract for the sale of goods, the Uniform Commercial Code applies. The purchaser was a California proprietorship and the seller an Iowa corporation. The circumstances surrounding the formation of the contract are not described in detail in the record, but it appears the offer represented by the purchase order was accepted by performance in Iowa. The choice-of-law rules of the forum state govern. *See Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621 (8th Cir.2004). "In *contract* cases, following the Second Restatement, Iowa applies the law of the state with the most significant relationships or interests in the litigation." *Grove v. Principal Mut. Life Ins. Co.*, 14 F.Supp.2d 1101, 1106 (S.D.Iowa 1998) (emphasis in original) (citing *Restatement (Second) of Conflicts of Law* § 188(1) (1971), and *Cole v. State Auto. & Cas. Underwriters*, 296 N.W.2d 779, 781 (Iowa 1980)); *see Washburn v. Soper*, 319 F.3d 338, 342 (8th Cir.),

*cert. denied*, 540 U.S. 875, 124 S.Ct. 221, 157 L.Ed.2d 136 (2003). With the place of contracting and performance occurring in Iowa, the relevant factors support the application of Iowa law. *See Gabe's Const. Co., Inc. v. United Capitol Ins. Co.*, 539 N.W.2d 144, 146 (Iowa 1995). The Court does not understand there to be any disagreement between the parties in this regard. The parties have not identified an actual conflict in the relevant UCC provisions adopted by the two states.

*The Merits*

■ Kliff's summary judgment argument is straightforward. The cards smelled bad and the unrebutted testimony of its experts is that the smell was caused by the BPA chemical in the adhesive which was not direct food contact compatible. Putting aside for the moment the question of how bad was the smell, Grace Label's response is that Kliff specified and approved the material components of the cards and it relied on Kliff and Barcel to select appropriate material as it had no expertise in the area. Grace Label's proof in this regard depends on the course of dealing between the parties. The evidence put forward in resistance to a motion for summary judgment must be admissible. *Morgan v. United Parcel Service of America, Inc.*, 380 F.3d 459, 467 (8th Cir.2004); *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir.2004). Kliff argues the Court must disregard Grace Label's course of dealing evidence because it is based in part on hearsay and represents impermissible parol evidence. It is therefore appropriate to begin with the evidentiary objections.

1. Hearsay.

The hearsay objection has to do with Mr. Grace's testimony that the materials used in the Spears job, including the adhesive, were originally specified by Barry McKillip of Chromium Graphics for the 66

million job. Kliff contends McKillip's statements to Grace Label in this regard are hearsay.

■■■■ McKillip's alleged instructions given to Grace Label about the materials it was to use on the 66 million job are not hearsay because they are not offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). The significance of the statement here has nothing to do with the truth of anything McKillip said, but only the fact that it was made. *See* Advisory Committee Note to Subdivision (c). Put another way, the credibility of the declarant, McKillip, is not material. *See* 5 *Weinstein's Federal Evidence* 2d ed. § 801.11[1] at 801–14. His statement is offered to explain why Grace Label used the Rad–Cure adhesive and, together with the other course of dealing evidence, its understanding of the contract requirements for the Spears card. Broadly speaking, communications relevant to the making of a contract and the existence of contract terms are "verbal acts" and not hearsay. *Mueller v. Abdnor,* 972 F.2d 931, 937 (8th Cir.1992); *see generally United States v. Manfre,* 368 F.3d 832, 839 (8th Cir.2004).

### 2. Parol Evidence.

The parol evidence rule also does not bar evidence of McKillip's instructions to Grace Label or the subsequent course of dealing between the parties. The UCC codifies a commercial version of the rule:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> a. by course of dealing or usage of trade ... or by course of performance.

Iowa Code § 554.2202(a). "Course of dealing" is a defined term meaning "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Id.* § 554.1205(1). A course of dealing "give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement." *Id.* § 554.1205(3). "Whenever reasonable" express terms and the course of dealing are to be construed consistent with each other. *Id.* § 554.1205(4). *See Hedrick Savings Bank v. Myers,* 229 N.W.2d 252, 255 (Iowa 1975).

■■■■ The parol evidence rule is a common-law rule of substantive law, not evidence. *Montgomery Properties Corp. v. Economy Forms Corp.,* 305 N.W.2d 470, 475 (Iowa 1981). It "excludes extrinsic evidence which is *solely* offered for the purpose of varying, adding to, or subtracting from a written agreement." *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984) (emphasis added). The rule does not exclude extrinsic evidence intended, not to change or vary the contract terms, but to explain what the parties meant by them. *Id.* The rule incorporated in the UCC reflects the common-sense "assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the [contract] document was phrased" and as a result opens the door even a little further. Iowa Code § 554.2202 cmt. 2. Unlike the common-law antecedent, when a UCC transaction in goods is involved, even a complete, fully integrated contract, may not only be explained, but supplemented by the course of dealing.[3] *C–Thru Con-*

---

**3.** For his part Kliff has offered extrinsic evi- dence of trade usage in the form of its expert

*tainer Corp. v. Midland Mfg. Co.*, 533 N.W.2d 542, 544–45 (Iowa 1995) (citing *Ralph's Distrib. Co. v. AMF, Inc.*, 667 F.2d 670, 673 (8th Cir.1981) (applying Iowa law)).

### 3. Nonconformity of the Spears Cards.

If Grace Label's course of dealing evidence is neither inadmissible hearsay nor prohibited by the parol evidence rule the Court must consider it and do so in the light most favorable to Grace Label. So viewed, the jury could reasonably find substantially as follows. The materials (including the offending adhesive) used for what became the standard for all of the Barcel jobs, originated with specifications provided to Grace Label by Mr. McKillip of Chromium Graphics in connection with the 66 million job. Mr. Kliff was president of Chromium Graphics at the time, was involved in both aspects of the overall project as discussed previously and, the jury could infer, was aware of and approved the contract circumstances. The 66 million job card was used successfully in Barcel's snack food packaging without complaint.

The next Barcel job, the Ponte Sobre Ruedas job, employed the same materials as the first, and again was used in Barcel's snack food packaging to the satisfaction of Barcel. When the Spears job presented itself a few months later, Mr. Kliff and Mr. Grace agreed Grace Label would use the same materials as in the previous jobs. The record does not indicate the parenthetical "Direct Food Contact Compatible" notation in the purchase order product description was a negotiated term. The parties have not identified evidence that it was discussed between them. Given this lack of direct evidence about what the parties meant, the jury might reasonably

infer from the course of dealing between them on the Barcel jobs, the "FDA Varnish" specification employed previously, the successful use of the earlier cards in Barcel's snack food packaging, and the discussions between Mr. Grace and Mr. Kliff preceding the Spears job that the parties intended a card made with the same materials and varnish would be direct food contact compatible.

The reports of Dr. McPeak and Mr. Lewis raise a serious question about whether the Spears cards used the same adhesive as in the previous jobs. The concentration of BPA in the Spears production cards was many times higher than in the supposedly similarly made prototype cards and, perhaps more significantly, in the Rad–Cure 12PSFLV control samples. The expert reports do not require summary judgment in Kliff's favor, however, because Mr. Grace insists the same materials, including the adhesive, were used in the Spears production and prototype cards, as well as in the previous Barcel jobs.[4]

Nor are the facts the Rad–Cure adhesive is not listed by it as being FDA food grade compliant and the FDA does not list BPA as a food grade acceptable chemical conclusive. There is, as noted, evidence Grace Label did not select the adhesive and the parties agreed the materials used on the previous Barcel jobs with FDA varnish would meet the product description. The purchase order did not expressly incorporate FDA standards beyond the varnish. There is no extrinsic evidence that across-the-board incorporation of federal FDA standards was intended by the direct food contact compatible description.

---

Lewis' affidavit statement concerning how the phrase "Direct Food Contact Compatible" is understood in the industry. (Def.App. at 35).

4. The cards printed in the previous Barcel jobs have evidently not been tested for similarity with the Spears production card.

There remains the odor problem for re-regardless of the chemical cause, a card with a strong offensive odor in direct contact with food could not reasonably be considered compatible with the food. There is a genuine issue of material fact concerning the offensiveness and strength of the odor. These are, to begin with, subjective sensations. Mr. Grace testified he did not detect an odor beyond the normal odor of fresh print work and that odor should have dissipated when the cards were aired out after being removed from their packaging.[5] Mr. Kliff inspected a large quantity of the cards at Grace Label's premises and did not complain of an offensive odor. After Barcel complained Mr. Kliff told Mr. Grace he, too, noticed the odor, but later that much of it had gone away and the cards would be okay. Employees of Barcel told Kliff that the cards had such an odor that they were not fit for use with food, but Mr. Kliff's testimony about what representatives of Barcel told him in this regard is hearsay when offered to prove the odor (though not in order to explain the reason Kliff ultimately rejected the cards). The only other witness to have commented on the odor of the cards, Dr. McPeak, described it as a "strong acrylate odor" which persisted on her skin for several hours. (Def. Supp.App. at 53; *see* Def.App. at 41).

If the jury believes Mr. Grace's testimony about the compositional similarity of the Spears cards to the others Grace Label produced for Barcel, it could conclude the odor was no worse than what had been found acceptable before. On this record, what the odor was and whether it rendered the cards incompatible for direct contact with food are the subject of con-flicting evidence to be resolved by the fact-finder.

4. The Prototypes.

■ Kliff has produced scientific evidence in the form of Dr. McPeak's testimony that the Spears production cards did not have the same composition as the prototypes. Mr. Grace says they did and, moreover, the prototypes were only for size and weight so that Barcel could see if they would work in its packaging equipment. Failure of the production cards to conform to the prototypes would be a breach of the contract between Grace Label and Kliff only if from the circumstances it was found that the prototypes were a "basis of the bargain" in which case an express warranty by Grace Label was created that "the whole of the goods shall conform to the sample." Iowa Code § 554.2313(1)(c).

Assuming the prototypes were made a part of the basis of the bargain (another fact dependent for its proof on extrinsic evidence), the scope of the resulting express warranty is a genuine issue of material fact. If Mr. Grace's testimony is credited, the warranty was only as to size and weight. His limited view of the purpose served by the prototypes finds some additional support in the record. The prototype cards did not bear Britney Spears image, but rather, a "Pineapple Upside Down Cake Secret Recipe." (Hrg.Ex. B). The prototypes thus were clearly not intended to exemplify print quality or the appearance of Ms. Spears' image. Whether the prototypes created an express warranty beyond size and weight is a fairly disputed fact question.

---

**5.** There may be some question about whether Barcel in fact attempted to air the cards out as Mr. Grace suggested when Mr. Kliff told him about the odor complaint. In his reply brief Kliff states "the Spears trading cards were still in the boxes packed by Grace Label when they were rejected." (Reply at 3).

5. Kliff's Alleged Acceptance.

Kliff maintains he rightfully rejected the Spears cards after Barcel rejected them because of their odor. *See* Iowa Code § 554.2602(1). Grace Label argues that Kliff accepted the cards following his inspection of them at its premises as they were being produced and that the later cancellation following Barcel's rejection was ineffective as a revocation of acceptance.

Mr. Grace testified that Mr. Kliff was at the plant the first week of production "proof[ing] the job." (Pltf.App. at 21). Grace Label brought multiple boxes of printed cards to Mr. Kliff in Grace Label's conference room. Kliff inspected them and took samples. (*Id.* at 21–25). Mr. Kliff said the cards were "great" and were what he wanted. (*Id.* at 25).

"Acceptance of goods occurs when the buyer ... after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming ...." Iowa Code § 554.2606. Mr. Kliff inspected the cards at Grace Label. Arguably the statements attributed to him following his inspection signified the cards conformed to the contract. If Mr. Kliff did not know of the claimed nonconformity (the odor) at the time he inspected the cards, he could subsequently revoke his acceptance only if it is shown he accepted the cards without discovery of the odor because his acceptance "was reasonably induced ... by the difficulty of discovery ...." Iowa Code § 554.2608(1)(b). Whether Kliff should reasonably have discovered the odor is a fact issue for the jury. *See St. Ansgar Mills, Inc. v. Streit*, 613 N.W.2d 289, 295 (Iowa 2000) (a UCC case). If Mr. Kliff accepted the cards with a nonconformity he should have discovered when he inspected them, the risk that Barcel would reject the cards is his.

## IV.

### RULING AND ORDER

For the reasons discussed, the Court concludes genuine issues of material fact exist which preclude summary judgment in Kliff's favor on either the Complaint or counterclaim. Kliff's motion for summary judgment is therefore **denied.**

IT IS SO ORDERED.